IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **REBECCA BLACKETT**,<br><br>                    Plaintiff,<br>v.<br><br>**BRAINSTORM, INC.**,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:21-CV-00415-JNP-DBP<br><br>District Judge Jill N. Parrish<br>Magistrate Judge Dustin B. Pead |

In June 2018, Defendant Brainstorm, Inc. ("Defendant" or "Brainstorm") hired Plaintiff Rebecca Blackett ("Plaintiff" or "Ms. Blackett") as an Enterprise Account Executive. After being placed on a performance improvement plan ("PIP"), Ms. Blackett was terminated in August 2019. She then filed the present suit, alleging sex discrimination and retaliation under Title VII. Brainstorm now moves for summary judgment on both of Ms. Blackett's Title VII claims. For the reasons set forth herein, Brainstorm's motion is **GRANTED**.

**BACKGROUND**

***Ms. Blackett's Supervisors***

In June 2018, Brainstorm hired Ms. Blackett to the role of Account Executive ("AE"), which is a salary- and commission-based sales position. ECF No. 36-2, ¶ 13. Casey Trujillo was Ms. Blackett's supervisor until August 2018, when Brainstorm hired Spencer Dean to take over Mr. Trujillo's role. ECF No. 36-2, ¶ 14. After August 2018, Mr. Dean was Brainstorm's national sales director, a position on Brainstorm's leadership team through which Mr. Dean oversaw and set sales quotas for all AEs. ECF No. 36-2, ¶ 8.

In May 2019, Mr. Dean received a more senior role and Gus Hytonen was promoted from

an AE position to Mr. Dean's former role, becoming Ms. Blackett's supervisor. ECF No. 36-2, ¶ 15. Due to Mr. Hytonen's lack of managerial experience, Mr. "Dean remained involved in managing [Ms. Blackett's] performance" following Mr. Hytonen's promotion. ECF No. 36-2, ¶ 15. Shortly after Mr. Hytonen's promotion, Ms. Blackett submitted an anonymous survey in which she critiqued Mr. Hytonen's management style. She wrote that she was "concerned at his management approach" and that "[m]eetings scheduled with [Mr. Hytonen] at this time are met with fear and trepidation." ECF No. 36-4, at 73. Ms. Blackett's survey response was not shared with Brainstorm's leadership team and Mr. Hytonen therefore did not see her response. ECF No. 36-4, at 16.

### Brainstorm's Operations

After Brainstorm hired an AE, he or she was placed onto a six-month "ramp-up period," during which the AE was not required to fully meet any set sales quota. ECF No. 36-2, ¶ 16. After an AE's ramp-up period, however, he or she was required to "stay on track" to meet his or her annual sales quotas by meeting quarterly sales requirements or "demonstrat[ing] a credible pipeline of deals likely to close by the end of the year." ECF No. 36-2, ¶ 9.

Mr. Dean's process for setting sales quotas was not an exact science. He considered a number of factors, including assigned sales territories, past sales and performance, the AE's other work responsibilities, and how a particular quota could be fair yet push an AE to improve his or her performance. ECF No. 36-2, ¶ 9. If an AE failed to meet his or her sales quota, Mr. Dean would address the situation on a "case-by-case" basis, considering factors including the AE's track record, "whether the AE had demonstrated progression of potential deals in their pipeline," the AE's "administrative excellence" in documenting sales progress in Defendant's customer relationship management ("CRM") software, and sales that fell through for reasons beyond an

AE's control. ECF No. 36-2, ¶ 9.

Performance improvement plans ("PIPs") are one tool Brainstorm uses to encourage AEs who underperform on their sales quotas to increase their sales numbers. *See* ECF No. 36-2, ¶ 12. Mr. Dean and other Brainstorm leaders collectively decide whether or when to place an employee on a PIP. *Id.* More precisely, Mr. Dean made PIP-related decisions with Brainstorm's Director of Operations Seth Smith and Mr. Dean's own supervisor, Defendant's Principal Executive Eric Farr. *Id.*

### *Ms. Blackett's Quotas and Sales*

Ms. Blackett's 2018 annual quota required her to make $750,000 in qualifying sales. ECF No. 36-2, at 39. Because Ms. Blackett was recently hired, however, she was placed on Brainstorm's usual six-month ramp-up period, during which she was not required to meet her full annual or quarterly quotas. ECF No. 36-2, at 7. Ms. Blackett only generated $255 in commissions during her ramp-up period, however, which concerned her supervisors. ECF Nos. 36-4, at 13–14, 59.

In May 2019, Brainstorm's AEs each received their 2019 annual sales quotas. ECF No. 36-2, ¶ 17. Ms. Blackett's quota required her to make $950,000 in qualifying "new and growth" sales by the year's end (meaning sales renewals did not count towards this quota). ECF No. 36-2, ¶ 17. To be considered "on track" relative to her quota, Ms. Blackett was expected to generate sales in the amount of $237,500 in quarter one, $247,000 in quarter two, $209,000 in quarter three, and $256,000 in quarter four. ECF No. 36-2, ¶ 17. Like other AEs, Ms. Blackett was instructed to prioritize small- to medium-sized deals throughout the year to stay on track to meet her quarterly quotas rather than pursuing only larger, more uncertain deals. ECF No. 36-2, ¶ 17. Ms. Blackett never complained that her annual quota was unfair or unattainable. ECF No. 36-2, ¶ 19. In July

2019, Ms. Blackett stated that she was "flooded with leads" but needed to close more deals—Mr. Dean agreed on both points. ECF No. 36-2, ¶ 19.

Ms. Blackett closed a large deal on April 30, 2019. ECF No. 36-4, at 14. But she made no sales in July or August of 2019, and she did not meet her assigned quarterly quota at any point during her employment at Brainstorm. ECF No. 36-4, at 14. In July 2019, Ms. Blackett's total annual sales summed to nearly $172,000 below her year-to-date quota. ECF No. 36-2, at 9. She made $112,200 in qualifying sales in the first quarter of 2019, which was less than half of her quarterly quota, and she made $200,500 in qualifying sales in the second quarter of 2019, which was around eighty percent of her quarterly quota. ECF No. 36-2, at 9.

### Ms. Blackett's PIP

In early 2019, Mr. Dean observed that Ms. "Blackett was struggling to accurately forecast the potential deals in the 'pipeline' of clients in her territory, she struggled to answer clients' questions about our products, her sales numbers were below her required quota, and she was not exhibiting CRM-administrative excellence." ECF No. 36-2, at 10. For example, Ms. Blackett's tracking of her projects in Brainstorm's CRM forecasted that she would end the year with nearly $4.5 million in sales, despite having closed only $312,700 in sales in the first half of that year. ECF No. 36-2, ¶¶ 18, 24. Ms. Blackett also seemed to focus her sales efforts on renewals (which did not count towards her quota) and risky large deals, despite Mr. Dean's encouragement for AEs to prioritize small and medium sized deals to meet their quarterly quotas. ECF No. 36-2, ¶ 24. Ms. Blackett also struggled to answer a client's questions about Brainstorm's product while on a sales trip with Mr. Dean. ECF No. 36-2, at 10. When Mr. Dean discussed these issues with Ms. Blackett, she "did not seem to incorporate [his] feedback into her performance." ECF No. 36-2, at 10. As a result, Mr. Dean began considering placing Ms. Blackett on a PIP in early 2019.

When Mr. Hytonen became Ms. Blackett's new supervisor in May of 2019, he observed similar issues regarding Ms. Blackett's performance. ECF No. 36-2, at 11. Based on Ms. Blackett's low sales numbers, her apparent challenges in advancing potential sales and forecasting the future completion of those deals, and her struggles to follow her supervisors' coaching on these issues, Mr. Dean, Mr. Hytonen, and other Brainstorm managers agreed as a group to place Ms. Blackett on a PIP. ECF No. 36-2, at 12–13. Mr. Dean "took the lead in preparing Blackett's PIP" because Mr. Hytonen was new to the sales manager role, but the two men agreed on the PIP's substantive terms. ECF No. 36-2, at 11.

Ms. Blackett received her PIP on July 3, 2019. ECF No. 36-2, ¶ 26. The PIP informed Ms. Blackett that she was required to do the following:

- Achieve 50% ($125,000 in Quick Help ARR) of your Q3 quota by August 15th 2019
- Achieve 100% ($250,000 in Quick Help ARR) of you[r] Q3 quota by September 30th, 2019
- Maintain Dynamics CRM Administrative Excellence
    - At Opportunity/Account levels: Correct contact info, phase, activity, history, next steps.
    - Accurate product line items (opportunity ARR value), accurate close date, MEDDPICC info etc.
- Show ongoing deal progression of pipeline (increase pipeline quantity and phase progression)
- Attend weekly 1:1 session with your director or team lead
- Accurate forecasting throughout quarter and on-going
- Must be open to change (willingness to try new things)
- No traveling to customer sites without the attendance of [Mr. Hytonen] or [Mr. Dean]
- All travel expenses must be submitted within 30 days of trip

ECF No. 36-3, at 8. Ms. Blackett's PIP specifically warned her that "[i]mprovement must occur immediately" in each of these areas and that if she violated the plan "during the specified timeframe [of 90 days], disciplinary action to include separation from the company may occur." ECF No. 36-8, at 8. This language was standard in PIPs that Brainstorm issued to other employees.

ECF No. 26-2, ¶ 26.

### *Ms. Blackett's Performance Under her PIP*

Twenty days after being placed on a PIP, Ms. Blackett informed Mr. Hytonen and Mr. Dean that she did not anticipate that she would be able to meet her quarterly sales quota by September 30, 2019 or half of her quarterly sales quota by August 15, 2019. ECF No. 36-2, ¶ 30. Despite receiving repeated advice from Mr. Dean and Mr. Hytonen that she should pursue small- and medium-sized deals to maximize her chances of satisfying her quarterly quotas, Ms. Blackett continued to focus "on a singular deal" that could satisfy her entire quarterly quota—if she managed to close the deal in time. ECF No. 36-2, at 16. This potential deal (the "Client No. 1 Opportunity") was only in its early stages on July 26, 2019. *Id.* at 16–17. Mr. Dean concluded that as a result, it was "very unlikely" to close during 2019 (let alone prior to Ms. Blackett's August 15th or September 30th deadlines to meet her sales quotas). ECF No. 36-2, at 17. Mr. Dean saw Ms. Blackett's continued pursuit of the Client No. 1 Opportunity—a single, large deal that imposed risk on Ms. Blackett's ability to meet her sales quotas—as emblematic of Ms. Blackett's broader failure to forecast the completion of deals through Brainstorm's CRM. *Id.* As a result, Mr. Dean concluded that Ms. Blackett was not going to satisfy her PIP's terms. On July 26, 2019, he first suggested Ms. Blackett's termination to other Brainstorm managers. *Id.*

On July 29, 2019, Mr. Dean emailed Ms. Blackett and eight other AEs, asking them to provide a final forecast of sales that they expected to close in July or August 2019. ECF No. 36-2, at 18. Ms. Blackett responded the following day, informing Mr. Dean that she forecasted two deals (not including the Client No. 1 Opportunity) would close in July or August. *Id.* If Ms. Blackett managed to close both of those deals, they would have summed to $120,000 in qualifying sales— only $5,000 shy of her PIP's $125,000 August 15 quota. *Id.* at 18–19. However, Mr. Dean

overserved that one of these deals was at a preliminary stage, while the other was not guaranteed to close by August 15, 2019. *Id.* Moreover, while on her PIP, Ms. Blackett requested to take two work trips, neither of which Mr. Dean believed would help her meet her August 15 sales quota. *Id.* Mr. Dean urged Ms. Blackett to focus on smaller deals that would close prior to her PIP-established quota deadlines, but she did not seem to take his advice. *Id.* As a result, Mr. Dean concluded that there was "no doubt in [his] mind that Blackett was not going to meet her August 15 or September 30 quota requirements, and it appeared very likely she would also not meet her annual quota requirement." *Id.* at 19.

On July 30, 2019, Mr. Dean emailed Mr. Farr, sharing his belief that Ms. Blackett wasn't going to meet her PIP sales quotas and asking about the process of replacing her with a new AE. ECF No. 36-2, at 20. In his response, Mr. Farr asked Mr. Dean to review Ms. Blackett's PIP to ensure "Brainstorm had abided by the terms of the PIP" and instructing Mr. Dean not to move forward with any termination decision until that was done. *Id.* at 20–21. Mr. Dean reviewed Ms. Blackett's PIP and concluded that "Brainstorm had abided by the terms of the PIP[.]" *Id.* at 21. Mr. Dean decided, with the help of Mr. Hytonen and Mr. Smith, to "move forward with terminating Blackett's employment." *Id.* On August 1, 2019, at 10:17 a.m., Mr. Dean sent Ms. Blackett a calendar invitation for a meeting the following day with the subject line "PIP Review." ECF No. 36-2, at 21. Mr. Dean planned to terminate Ms. Blackett during this meeting, although his email did not say so outright. *Id.*

### *Ms. Blackett's Discrimination Complaint and Brainstorm's Response*

Sixteen minutes after receiving Mr. Dean's email inviting her to the "PIP Review" meeting, Ms. Blackett emailed Mr. Farr and Mr. Dean, stating that she "would formally like to complain of discrimination regarding my treatment by my new manager, Gus Hytonen. In short, I believe he

treats me differently because of my sex." ECF No. 36-3, at 55. Mr. Farr responded to Ms. Blackett, informing her that "BrainStorm takes these allegations very seriously and will take appropriate steps to look into the concerns you've raised." ECF No. 36-3, at 54. Andrew Wojciechowski, Brainstorm's Legal Director, also responded to Ms. Blackett's email, asking to meet with her the following morning to discuss her allegation. *Id.* Mr. Dean's meeting with Ms. Blackett (in which he planned to terminate her employment) was cancelled pending the outcome Mr. Wojciechowski's investigation. ECF No. 36-4, at 8.

Brainstorm has a policy that prohibits workplace harassment and discrimination on the basis of sex. ECF No. 36-4, at 4. The policy also states that an alleged violation of that rule will be "investigated as promptly as possible by an impartial and qualified person and, upon conclusion of such investigation, appropriate corrective action will be taken where warranted." ECF No. 36-4, at 5. Mr. Wojciechowski conducted an investigation on Brainstorm's behalf. This process began by removing Mr. Hytonen from "any decision-making role with respect to Blackett, effective immediately[,]" because Ms. Blackett's complaint only alleged wrongdoing by Mr. Hytonen. *Id.* at 8. As a result, Mr. Dean returned to his prior role as Ms. Blackett's supervisor during Mr. Wojciechowski's investigation. *Id.* Mr. Hytonen was not involved in any decisions regarding her employment after Ms. Blackett made her complaint on August 1, 2019. ECF No. 36-4, ¶ 21.

Mr. Wojciechowski conducted his investigation into Ms. Blackett's complaint of discriminatory treatment with assistance from Mr. Smith and Jeff Engh, who was employed by a third-party human resources company, Helpside, and who assisted Mr. Wojciechowski in conducting investigatory interviews. ECF No. 36-4, ¶ 22. From the beginning, Mr. Wojciechowski was suspicious of the truth of Ms. Blackett's complaint based on the timing of her complaint relative to Mr. Dean's "PIP Review" meeting invitation and Ms. Blackett's lack of previous

complaints. ECF No. 36-4, ¶ 23.

Mr. Wojciechowski's investigation included interviews with Ms. Blackett, Mr. Hytonen, Mr. Dean, Mr. Trujillo, and Ben Rich, one of Ms. Blackett's fellow AEs. ECF No. 36-4, at 9. In her interview, Ms. Blackett presented her side of the story, explaining the circumstances in which she had felt singled out and discriminated against by Mr. Hytonen. *Id.* at 9–10. In Mr. Hytonen's interview, he explained to Mr. Wojciechowski why Brainstorm placed Ms. Blackett on a PIP and why the terms of that PIP were different in some material respects than other PIPs. *Id.* at 10–12. Mr. Hytonen also denied treating Ms. Blackett differently due to her sex. *Id.* Mr. Dean spent his interview with Mr. Wojciechowski detailing the basis upon which he and Brainstorm's other managers had determined to terminate Ms. Blackett's employment. *Id.* at 12–13.

Mr. Wojciechowski also reviewed documents and other information in his investigation. Through this process, he learned that no other employee had raised a complaint against Mr. Hytonen related to discrimination or any other issue. EECF No. 36-4, at 13. Mr. Wojciechowski reviewed sales information confirming that Ms. Blackett had failed to achieve her quotas up to the time she was placed on a PIP, had made no sales in July 2019, and did not meet her quarterly quota at any point during her employment. *Id.* at 14. As a result, Mr. Wojciechowski concluded that "Ms. Blackett was placed on a PIP for business-related reasons (not because of her sex)." *Id.* Mr. Wojciechowski found continued support for this conclusion after reviewing the employment records of male AEs, including some who were placed on PIPs. Following this portion of his investigation, Mr. Wojciechowski again concluded that Ms. "Blackett was not treated unfairly based on her sex by being placed on a PIP or by being terminated." *Id.* at 14–15.

Mr. Wojciechowski also considered Ms. Blackett's concern that Mr. Hytonen participated in the decision to place her on a PIP as retaliation for her response to an anonymous survey on

May 29, 2019, shortly after Mr. Hytonen became her supervisor. ECF No. 36-4, at 16. Mr. Wojciechowski discovered that Ms. Blackett's survey response, in which she critiqued Mr. Hytonen's management style, had not been shared with any Brainstorm staff following the survey's completion. *Id.* Mr. Hytonen confirmed to Mr. Wojciechowski that he had not previously seen Ms. Blackett's survey response, which Mr. Wojciechowski found no reason to disbelieve. *Id.* at 16–17. Mr. Wojciechowski also noted that Mr. Hytonen did not act alone in placing Ms. Blackett on a PIP, setting that PIP's terms, or deciding to terminate her in August 2019. *See* ECF No. 36-4, at 17.

Following his investigation, Mr. Wojciechowski concluded that there was "no evidence of discrimination or retaliation by Hytonen against Blackett." ECF No. 36-4, at 18. Mr. Wojciechowski presented this conclusion and its supporting rationale to Ms. Blackett on August 12, 2019. *Id.* Later that day, Mr. Wojciechowski met with Mr. Farr and Mr. Dean, informing them "that the company could make whatever employment decision they felt was appropriate with respect to Blackett's performance." ECF No. 36-4, at 19. The two managers agreed to move forward with Ms. Blackett's termination. *Id.* Mr. Dean stated that he would terminate Ms. Blackett even if she closed the Client No. 1 Opportunity, and thereby met her PIP's sales quotas, due to "the other issues with her employment, including her lack of CRM-administrative excellence and that she was not coachable." ECF No. 36-4, at 19. Ms. Blackett was informed of her termination that same day. *Id.* On July 8, 2021, Ms. Blackett filed the present suit, alleging that Brainstorm is liable under Title VII for both discrimination and retaliation. ECF No. 2.

### *Other Employees' PIPs*

At least three male AEs were placed onto PIPs between January 2019 and January 2020. None of these AEs received a PIP with terms identical to those in Ms. Blackett's PIP. Notably,

however, *none* of the AEs received identical PIPs. Each PIP was tailored to the particular AE's circumstances and the issues that his or her supervisors believed required attention.

On January 10, 2019, Mr. Dean placed a male AE ("G.R.") on a PIP. *See* ECF No. 53, at 8. G.R.'s PIP contained many of the same terms as Ms. Blackett's PIP. Both Ms. Blackett and G.R. were required to maintain CRM administrative excellence, to accurately forecast deals throughout the quarter and on an on-going basis, to increase their pipeline quantity by progressing on more sales deals, and to attend weekly one-on-one meetings with their directors or team leads. *Id.* Both employees were asked to be open to trying new things to improve their performance. *Id.* Both employees were required to meet 100% of their quarterly sales quota. *Compare* ECF No. 36-3, at 8 *with* ECF No. 53, at 8. Only Ms. Blackett, however, was required to meet half of her quarterly sales quota at the quarter's mid-way point. *Id.* On the other hand, G.R. was required to immediately reduce "negative feedback from customers and co-workers[,]" which Ms. Blackett did not have added as a condition in her PIP. *Id.* Unlike Ms. Blackett, G.R. was not told that Mr. Hytonen or Mr. Dean needed to accompany him on any work-related travel. *Id.* Ms. Blackett received this condition, however, because Mr. Hytonen and Mr. Dean had witnessed Ms. Blackett derail client meetings in past travel, and therefore felt the additional condition was necessary in her case. ECF No. 36-4, at 11. G.R. "improved his performance and substantially met the requirements of his PIP" and was therefore not terminated. ECF No. 63-3, at 3.

On April 29, 2019, another male AE ("J.S.") was placed on a PIP. ECF No. 53, at 13. J.S., like G.R., was required to immediately reduce negative feedback from co-workers. *Id.* Ms. Blackett did not receive this condition in her PIP. ECF No. 36-3, at 8. J.S. also received a unique condition requiring him to immediately reduce the "number of cycles it takes with you on deals[.]" ECF No. 53, at 13. J.S. received neither the same travel restrictions as Ms. Blackett nor the

requirement to meet half of his quarterly sales quota by the quarter's mid-way point. *Id.* Instead, J.S. received a condition in his PIP requiring him to achieve $200,000 in "Quick Help ARR over the next 3 months"—a condition that appears comparable to Ms. Blackett's requirement to meet her quarterly quota, but altered to address J.S.'s own performance issues. *Id.* Like G.R., J.S. "improved his performance and substantially met the requirements of his PIP[,]" and was therefore not terminated. ECF No. 63-3, at 3.

On January 20, 2020, several months after Ms. Blackett's termination, Mr. Hytonen placed another male AE ("D.H.") on a PIP. ECF No. 53, at 16. D.H.'s PIP required him to "[a]bide by all travel policies[,]" though D.H.'s PIP did not fully mirror the unique travel requirements imposed in Ms. Blackett's PIP. *Id.* D.H. was required to achieve 100% of his first quarter sales target by April 20, 2020, but he was not required to meet half of his quarterly quota by the quarter's mid-way point. *Id.* Like Ms. Blackett, D.H. was terminated when he failed to meet his PIP's requirements. ECF No. 63-3, at 3.

A fourth male AE ("J.C.") fell behind on his sales quotas in late 2018, but his low sales numbers for that period were excused because he was in a ramping up period. ECF No. 63-3, at 2–3. J.C. was subsequently reassigned to a new territory, where he was granted a new ramp-up period. *Id.* at 3. As a result, J.C. was neither placed on a PIP nor terminated despite his failure to achieve his sales quotas in the second half of 2018 and the first half of 2019. *Id.*

**SUMMARY JUDGMENT STANDARD**

"Summary judgment is appropriate if the admissible evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Allen v. SouthCrest Hosp.*, 455 Fed. App'x 827, 830 (10th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). To obtain summary judgment, a movant that bears the ultimate burden of proof at trial must

therefore show that no reasonable jury "could find other than for [that] party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (citation omitted). The movant bears the burden to produce evidence establishing the absence of a genuine issue of material fact on the claims or elements upon which it seeks judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Kannady v. City of Kiowa*, 590 F.3d 1161, 1168-69 (10th Cir. 2010) (citations omitted). "[I]n response to a properly supported motion for summary judgment," the opposing party "must produce sufficient evidence for a reasonable trier of fact to find in its favor at trial on the claim or defense under consideration." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).

"A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *See Fuit v. Extreme Prod. Grp., LLC*, No. 1:16-CV-35-RJS, 2018 WL 1801914, at *1 (D. Utah Apr. 13, 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 212, 248 (1986)). Moreover, "[t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Intern., Inc*., 366 F.3d 869, 875 (10th Cir. 2004). "[W]hen the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (cleaned up). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted).

ANALYSIS

In opposing Brainstorm's summary judgment motion, Ms. Blackett relies upon circumstantial evidence to prove her discrimination and retaliation claims. She therefore invokes the *McDonnell Douglas* framework, which consists of a three-step burden-shifting test through which a Title VII plaintiff may avoid summary judgment and present her case to a jury of her peers despite producing no direct evidence of discrimination or retaliation. At *McDonnell Douglas* step one, the plaintiff must demonstrate that her termination occurred in circumstances giving rise to an inference of discrimination. At step two, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. If the employer does so, the burden returns to the plaintiff to prove that a reasonable jury could find by a preponderance of the evidence that the employer's proffered reasons for her termination are pretextual. If the plaintiff does so, summary judgment is properly denied in all but unusual cases. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Barrett v. Salt Lake City*, 754 F.3d 864, 867 (10th Cir. 2014). Because Ms. Blackett cannot prove that a reasonable jury could find that Brainstorm's proffered nondiscriminatory and nonretaliatory reasons for her termination are pretextual, the court grants summary judgment on both of Ms. Blackett's claims.

## I.   SEX DISCRIMINATION

### A.  LEGAL STANDARD

Ms. Blackett's sex-based discrimination claim requires her to prove "that she is a member of a protected class, she suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination." *Bennett v. Windstream Communs., Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) (citing *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007)). In its motion, Brainstorm contests neither that Ms.

Blackett is a member of a protected class nor that she suffered an adverse employment action. At *McDonnell Douglas* step one, the court therefore concentrates upon the "critical prima facie inquiry" of "whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Taft v. Utah Dep't of Agric. & Food*, Case No. 2:21-cv-00289-JCB, 2022 U.S. Dist. LEXIS 150593, at *30 (D. Utah Aug. 19, 2022) (citing *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1151 (10th Cir. 2008)). Ms. Blackett stipulates that Brainstorm has articulated a legitimate, nondiscriminatory reason for her termination, satisfying its burden at *McDonnell Douglas* step two. Thus, if Ms. Blackett proves her prima facie case, the burden will remain with her to also prove that a reasonable jury could find by a preponderance of the evidence that Brainstorm's proffered reasons for her termination are pretextual. *See Barrett*, 754 F.3d at 867; *Ellis v. Salt Lake City Corp.*, Case No. 2:17-CV-00245-JNP-JCB, 2023 U.S. Dist. LEXIS 58619, at *51 (D. Utah Mar. 31, 2023) (quoting *McDonnell Douglas*, 411 U.S. at 802).

### B. MS. BLACKETT'S PRIMA FACIE CASE

#### i. *Legal Standard*

To establish her prima facie case, Ms. Blackett need only establish by a preponderance of the evidence that her termination occurred under circumstances that give rise to an *inference* of unlawful discrimination. *See DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969–70 (10th Cir. 2017) (emphasis added). This burden is "relatively lax" and is "not onerous." *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1241 (10th Cir. 2004); *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1197 (10th Cir. 2000). A reasonable jury could find by a preponderance of the evidence that Ms. Blackett's termination occurred in circumstances giving rise to an inference of discrimination. Several facts in the record support this conclusion.

ii.      *Analysis*

Ms. Blackett's argument in support of her prima facie case starts off on the wrong foot. She mistakenly argues that her prima facie burden is entirely met by the mere fact that her job position was not eliminated following her termination. *See* ECF No. 50, at 58–59 (citing *Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1227–29 (10th Cir. 2000)). On this point, Ms. Blackett appears to misread the relevant cases, which do not support her position.[1] Nonetheless, three relevant facts support the conclusion that a reasonable jury could find that Ms. Blackett's termination occurred in circumstances giving rise to an inference of discrimination.

First, Ms. Blackett argues that the temporal proximity between Mr. Hytonen's elevation to his role as her supervisor, her subsequent placement on a PIP, and her ultimate termination supports an inference of discrimination. In making this argument, Ms. Blackett analogizes her termination to that of an employee who is terminated shortly after her employer learns of her disability status. ECF No. 50, at 59 (citing *Butler v. City of Prairie Vill.*, 172 F.3d 736, 749 (10th Cir. 1999)). Ms. Blackett's case is dissimilar to *Butler* and similar cases because Ms. Blackett does not allege that there was temporal proximity between her employer's discovery of her status within a protected class (i.e., that she is a woman) and her subsequent termination. Yet other facts regarding the timeline of Ms. Blackett's termination could support a finding that her termination occurred in circumstances giving rise to an inference of discrimination. Brainstorm's managers terminated Ms. Blackett on August 12, 2019, which was three days before the first sales quota deadline in Ms. Blackett's PIP had even passed. ECF No. 36-4, at 19. Her managers made this

---

[1] *Kendrick* did not establish that a plaintiff may meet her prima facie burden merely by dint of the fact that her position was not filled following her termination. Instead, *Kendrick* held that a plaintiff need not prove—as a fourth element of her prima facie case—that her position *was* filled by a new employee outside of her protected class. *See Kendrick*, 220 F.3d at 1227–29. Ms. Blackett's reliance on this case is therefore unavailing, and the court proceeds to determine whether she adequately established her prima facie case.

decision to terminate her the same day that the investigation into her complaint of sex-based discrimination was closed. *Id.* And they terminated her on this day despite her prior representation that she thought she could possibly close two deals in July and August 2019, which would have amounted to $120,000 in qualifying sales—only $5,000 shy of her August 15 quota. ECF No. 36-2, at 18–19. A reasonable jury could find this to be evidence that Ms. Blackett's termination occurred in circumstances giving rise to an inference of discrimination because she was terminated immediately after Brainstorm's investigation ended despite a possibility that she could still substantially meet her PIP's sales quota.

Second, Ms. Blackett argues that her prima facie case is supported by evidence that she received differential treatment relative to Brainstorm's similarly situated male employees: J.C., J.S., G.R., and D.H.[2] Ms. Blackett has produced spreadsheets that purport to document her sales quotas and quota attainment relative to these male AEs, but these exhibits appear to lack authentication that would permit them to qualify as admissible business records.[3] Despite this, Ms.

---

[2] The court finds that Plaintiff could not meet her burden at the third step of the *McDonnell Douglas* framework even with the benefit of a presumption that she was similarly situated to these four male AEs. As a result, the court presumes without deciding that these employees are similarly situated. The foregoing demonstrates that whether the employees are actually similarly situated—which is ordinarily a fact for the jury to decide—is not material to the present dispute and therefore does not foreclose summary judgment.

[3] For example, Ms. Blackett produced a spreadsheet as Exhibit 7 to her brief opposing Brainstorm's summary judgment motion. *See* ECF No. 50-3, at 3–4. Exhibit 7 purports to be a spreadsheet comparing the quota attainment of each of Brainstorm's AEs. *Id.* Ms. Blackett appears to have annotated the spreadsheet with personal comments comparing her sales numbers to those of her coworkers, and the exhibit shows that it was copied from an email either sent to or from an individual not otherwise mentioned in the parties' briefs. *Id.* As Brainstorm notes, Ms. Blackett has not produced any testimony to authenticate this exhibit or the quota attainment numbers listed in it. Exhibit 7 therefore appears to fall shy of the authentication requirement set forth in Federal Rule of Evidence 901(a). Moreover, absent authentication that this spreadsheet was produced by Brainstorm and testimony going to the record's production, additional questions arise regarding this exhibit's admissibility under Federal Rule of Evidence 803(6). Of course, Ms. Blackett "need not produce evidence 'in a form that would be admissible at trial'" to oppose Brainstorm's summary judgment motion. *Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 485 (10th Cir. 1995) (quoting *Celotex*, 477 U.S. at 324). But the "content or the substance of the evidence must be admissible." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). Because Ms. Blackett has failed to demonstrate that the content or substance of her Exhibit 7 would be admissible at trial in any form, the court will look only to Ms. Blackett's other evidence regarding her treatment relative to that of other AEs. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (directing the court to consider only evidence that would be available to the jury when resolving a summary judgment motion).

Blackett has produced other evidence supporting her claim that she was treated differently at work than her similarly situated male coworkers. Ms. Blackett's PIP, for example, contains terms that differ from those included in PIPs issued to Brainstorm's male AEs. Ms. Blackett's PIP required her to meet half of her quarterly sales quota during the first half of the quarter while other AEs received PIPs that merely required them to get back on track with their quarterly sales quotas. *Compare* ECF No. 36-3, at 8 *with* ECF No. 53, at 8. Ms. Blackett's PIP also imposed restrictions on her ability to travel for work, while other AEs who received PIPs were permitted their normal leave to go on work-related travel to make sales. *Id.* Similarly, Ms. Blackett would have been terminated even if she had entirely met her PIP's sales quota. *See* ECF No. 36-4, at 19. At least two male AEs, on the other hand, were permitted to maintain their employment after being placed on PIPs because they merely "improved" their performance and "substantially" met the requirements in their PIPs. ECF No. 63-3, at 3. The record presents no indication that Ms. Blackett's managers applied such a forgiving standard when her performance was measured against her PIP's requirements.

Finally, Brainstorm's shifting rationales and ultimate reliance upon subjective criteria to justify Ms. Blackett's termination provide additional reasons why a reasonable juror could find that Ms. Blackett's termination occurred in circumstances giving rise to an inference of discrimination. On August 1, 2019, Mr. Dean explained the initial decision to terminate Ms. Blackett by stating that "[t]here is no way she is going to hit her number in the PIP." ECF No. 50-1, at 221. This message strongly suggests that Mr. Dean wanted to terminate Ms. Blackett because she was not going to meet her August 15 sales quota. Mr. Dean continued: "Though we are not at 8/15, I assume she is failing on the other steps required in the PIP (CRM excellence, etc.)." *Id.* at 220. Later, Mr. Dean explained to Mr. Wojciechowski that he not only *assumed* Ms. Blackett was

failing at non-quota related requirements in her PIP, but that he would terminate her employment based *solely* on those factors. ECF No. 36-4, at 19. A reasonable jury could determine from these facts that Mr. Dean's termination decision was based on subjective criteria that he only assumed Ms. Blackett was failing to satisfy. It would not be unreasonable to find that decision suggestive that Ms. Blackett's termination occurred in circumstances giving rise to an inference of discrimination.

Particularly in light of the "relatively lax" standard for establishing a prima facie case under *McDonnell Douglas*'s first step, Ms. Blackett appears to have adequately demonstrated that her termination occurred in circumstances giving rise to at least an inference of discrimination. *See Annett v. Univ. of Kansas*, 371 F.3d 1233, 1241 (10th Cir. 2004). Because Ms. Blackett concedes that Brainstorm has proffered legitimate, nondiscriminatory reasons for her termination, the court now proceeds to step three, where it considers whether a reasonable jury could find those reasons to be pretextual by a preponderance of the evidence.

## C. MS. BLACKETT'S EVIDENCE THAT DEFENDANT'S LEGITAMITE, NONDISCRIMINATORY REASONS FOR HER TERMINATION ARE PRETEXTUAL

### i. *Legal Standard*

A plaintiff produces sufficient evidence of pretext when she shows "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005). To avoid summary judgment, the plaintiff's burden is to demonstrate that a reasonable jury could find pretext under this standard "by a preponderance of the evidence[.]" *DePaula*, 859 F.3d at 970. In

conducting this analysis, the court is cautious not to act as a "super personnel department" or second-guess good-faith business judgments. *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006); *see also Turner v. Public Serv. Co.*, 563 F.3d 1136, 1144 (10th Cir. 2009); *accord Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007) ("The relevant inquiry is not whether their proffered reasons were wise, fair or correct, but rather we ask whether they believed those reasons to be true and acted in good faith upon those beliefs.") (internal quotations omitted and cleaned up).

"[O]nce a plaintiff presents evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason, we presume the jury could infer that the employer acted for a discriminatory reason and must deny summary judgment." *Bryant*, 432 F.3d at 1125. "This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000). Thus, if a plaintiff adequately demonstrates that the employer's proffered nondiscriminatory reasons for her termination are pretextual, the court must still look to several factors, "includ[ing] the strength of the [employee's] prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered" to determine whether to grant summary judgment. *Id.* at 148–49.

Ms. Blackett presents a number of arguments in support of her contention that Brainstorm's nondiscriminatory reasons for her termination are pretextual. After reviewing these arguments, however, the court determines that a reasonable jury could not return a verdict in Ms. Blackett's

favor. The court therefore grants Brainstorm's summary judgment motion.

> ### ii.    *Analysis*

The first argument Ms. Blackett presents in support of her pretext claim is that Brainstorm conducted an imperfect investigation of her complaint that Mr. Hytonen discriminated against her based on her sex. For example, Ms. Blackett alleges that Brainstorm failed to follow its clearly stated policy that "[a]ll complaints of unlawful harassment which are reported to management will be investigated as promptly as possible by an impartial and qualified person" when it tasked its in-house counsel with conducting the investigation. She also argues that in conducting his investigation, Mr. Wojciechowski created no investigative file, made no findings of fact or credibility assessments, and issued no specific conclusions. Thus, Ms. Blackett argues that Mr. Wojciechowski reported to the company that no discrimination had occurred without adequately addressing her complaint or corroborating statements made by Ms. Blackett's fellow AE, Ben Rich. Instead, Ms. Blackett argues, Mr. Wojciechowski supported his investigation's conclusions with nothing besides interview summaries written by someone else.

Even presuming that Brainstorm failed to follow its established investigatory procedures, the court must recognize that "an employer's failure to follow its own internal procedures does not necessarily suggest that the substantive reasons given by the employer for its employment decision were pretextual." *Markley v. U.S. Bank N.A.*, 59 F.4th 1072, 1082 (10th Cir. 2023). Moreover, "an employer may ordinarily defeat the inference of pretext stemming from an allegedly unfair investigation by simply asking an employee for [her] version of events." *Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1314 (10th Cir. 2017) (citing *E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 488 (10th Cir. 2006)); *see also Kendrick*, 220 F.3d at 1231 (declining to find an inadequate investigation where "[i]mportantly, in the course of his investigation [the

decision-maker] asked the [plaintiff-employee] to give his version of the [events]"). Because Mr. Wojciechowski asked Ms. Blackett to share her version of events through an investigatory interview, the alleged deficiencies in Brainstorm's investigation could not suffice to demonstrate that its nondiscriminatory reasons for Ms. Blackett's termination were pretextual. Indeed, Brainstorm's investigation into Ms. Blackett's complaint provides little to no evidence that Brainstorm's reasons for terminating Ms. Blackett were pretextual.

Ms. Blackett's second pretext argument is that Brainstorm "attempts to support Blackett's termination, in part, based upon subjective criteria[,]" which she calls "classic evidence of pretext." ECF No. 50, at 68. By itself, "the use of subjective considerations by employers is not unlawful *per se*[,] but "the presence of subjective decision-making can create a strong inference of discrimination[.]" *Turner*, 563 F.3d at 1145 (citation and internal quotation marks omitted). Nevertheless, the Tenth Circuit "typically infer[s] pretext . . . only when the criteria on which the employers ultimately rely are *entirely subjective* in nature." *Turner*, 563 F.3d at 1145 (citation and internal quotation marks omitted) (emphasis added). Ms. Blackett's reliance on Brainstorm's subjective criteria to support an inference of pretext therefore suffers from two faults. First, Brainstorm's managers relied upon both objective and subjective criteria when making the decision to terminate Ms. Blackett. Ms. Blackett's failure to close any sales in July 2019 and her admitted inability to meet her August 15 sales quota was one factor in her termination, and this factor is relatively objective. Second, the other criteria that Ms. Blackett critiques—her CRM administrative excellence and coachability—while somewhat subjective, are neither amorphous nor arbitrary. Facts in the record support Brainstorm's decision to use each of these criteria in terminating Ms. Blackett's employment. For example, Mr. Dean discussed his observation of Ms. Blackett's challenges in accurately recording information in Brainstorm's CRM and using that

information to adequately forecast when potential sales deals might close. ECF No. 36-2, at 10–11. Moreover, Mr. Dean's concerns regarding whether Ms. Blackett was coachable at work are supported by evidence showing that despite her managers' repeated admonitions to pursue smaller deals to ensure she could meet her quarterly quotas on time, Ms. Blackett continued dedicating her attention to larger (but more uncertain) deals. ECF No. 36-2, ¶ 24. Because the criteria used to justify Ms. Blackett's termination are not "entirely subjective[,]" an inference of pretext does not follow from these facts. *See Turner*, 563 F.3d at 1145.

Finally, Ms. Blackett raises the issue of temporal proximity and the timeline of her termination, arguing that Brainstorm "failed to allow Blackett to complete the PIP or to have terms similar to all other PIPs that it issued – namely, the opportunity to hit quota at the end of the quarter." ECF No. 50. But this argument does not significantly aid Ms. Blackett in demonstrating that a jury could reasonably find the reasons for her termination pretextual. First, Ms. Blackett informed her supervisors in advance that she was not going to meet her PIP's sales quotas by either August 15 or September 30, which provides one clearly nondiscriminatory reason why Ms. Blackett's managers did not allow her to continue working through the end of September. ECF No. 36-2, ¶ 30. Second, as mentioned above, Ms. Blackett had shown a pension to hunt large deals, which, if they failed to close, jeopardized her ability to meet her quarterly sales quotas. Her supervisors repeatedly urged her to revise this pattern of conduct, but she declined to do so. ECF No. 36-2, ¶ 24. As a result, neither the timeline of Ms. Blackett's termination nor the fact that her PIP required her to meet half of her quarterly sales quota by August 15 suggests that Brainstorm's proffered reasons for her termination were pretextual. These facts instead indicate that Ms. Blackett's employer wanted to incentivize her to quickly close small deals after she had failed to follow her supervisors' requests to do so.

In summary, Ms. Blackett's only evidence that Brainstorm's stated nondiscriminatory reasons for her termination are pretextual are the facts that Brainstorm's investigation into her complaint was imperfect, that Brainstorm justified her termination based on partially subjective criteria, that Ms. Blackett's PIP contained terms different from those included in her male coworkers' PIPs, and that Ms. Blackett was terminated before her PIP's August 15 sales quota deadline, shortly after the investigation into her discrimination complaint closed. These facts are insufficiently probative of Ms. Blackett's argument that Brainstorm's nondiscriminatory reasons for her termination are pretextual. Even considering Ms. Blackett's collective evidence, a reasonable jury could not find by a preponderance of the evidence that Brainstorm's reasons for her termination were pretextual. Ms. Blackett therefore failed to meet her burden under the *McDonnell Douglas* framework to prevent the entry of summary judgment. On this basis, the court grants Brainstorm's motion.

## II.   RETALIATION

Ms. Blackett's retaliation claim is subject to the same *McDonnell Douglas* burden-shifting framework as her discrimination claim. Under this standard, a plaintiff's burden is to make a prima facie showing of retaliation. *Barrett*, 754 F.3d at 866-67. If she does so, the defendant must proffer legitimate, nonretaliatory reasons for her termination. *Id.* It is then the plaintiff's burden to "assert specific facts establishing a triable issue as to whether the employer's reason for discharge is a mere cover-up or pretext for retaliatory discharge." *See, e.g., Braxton v. Walmart Inc.*, No. 22-3003, 2023 U.S. App. LEXIS 3762, at *11 (10th Cir. Feb. 16, 2023) (unpublished) (quoting *Foster v. AlliedSignal, Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002)).

To support her retaliation claim, Ms. Blackett states only that "[t]he same evidence that supports [her] claim of discrimination supports her claim of retaliation." ECF No. 50, at 73–74.

The court has already determined that Ms. Blackett failed to demonstrate that a reasonable jury could conclude that Brainstorm's proffered nondiscriminatory and nonretaliatory reasons for her termination are pretextual. The same conclusion applies with respect to Ms. Blackett's retaliation claim, and the court therefore grants Brainstorm's summary judgment motion on this claim as well.

**ORDER**

For the reasons stated herein, Defendant's Motion for Summary Judgment is **GRANTED**.

Signed March 20, 2024

BY THE COURT

Jill N. Parrish
United States District Court Judge